**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Courtney Humiston

Plaintiff,

v.

AdventHealth Tampa

Defendant.

Case No.: $8:26$-$cv$-$2073$-$TPB$-$NHA$



FILED

JUL 20 2026

CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA FLORIDA

## I. Jurisdiction

This is the court that has federal jurisdiction because the action of disability discrimination and retaliation, sex-based discrimination and retaliation, and whistle-blowing retaliation arises under federal law as per the federal statutes under ADA and FMLA.

Plaintiff has exhausted the required administrative process by filing a complaint with the FCHR and EEOC charge and receiving a Notice of Right to Sue before filing suit.

## II. Venue

The Middle District of Florida, Tampa Division is the proper venue for the lawsuit because the events the Plaintiff is challenging allegedly occurred in Tampa, Florida and the defendant conducts business in Tampa, Florida.

## III. Parties

Courtney Humiston vs. AdventHealth Tampa

## IV. Administrative Exhaustion

FCHR No. 2026115240 Complaint of discrimination filed with the Florida Commission on Human Relations (Commission) with a Determination of No Reasonable Cause. EEOC Charge Number: 15D-2025-01397; Notice of Right to Sue date: April 21, 2026.

## V. Statement of Facts



$405
TPA74620

## I. Initial Employment Mar 2019 - July 2020

In 03/2019 AdventHealth acquired McIllwain Medical Group and its research department under AdventHealth Medical Group and then in 04/2019, pulled the research department over to AdventHealth Tampa. During the acquisition process, HR representatives came to the staff office to explain and review details on pay and benefits. It was at this time, Ms. Humiston experienced her first encounter of discrimination as she was 7 month pregnant and the HR representative unprompted and unprovoked had pointed her out stating "We're not going to take care of that" gesturing to her apparent pregnancy. Ms. Humiston was also told by AdventHealth HR staff that all research staff would transfer over at the same base pay rate regardless of position/ role, education, and experience until each individual staff member had met with the Director of Research, Beth Kohl, and be increased accordingly. Ms. Humiston was also told that prior time worked at McIllwain Medical Group (Seniority) would be brought over & honored under AdventHealth; however, when Ms. Humiston tried to apply for FMLA, she was notified she could not receive it because she had not been working for AdventHealth for at least a year. She was notified she could take 30-day personal leaves since AdventHealth also did not offer maternity leave at that time. Ms. Humiston took (3) 30-day personal leave unpaid starting 05/ 2019 and returned to work 08/2019. At this time, the research Director, Beth Kohl, sent Ms. Humiston an email for a meeting. Ms. Humiston attended the meeting set for 09/2019, where a 90-day review was completed. At this meeting Ms. Humiston, who was a Clinical Research Coordinator - Registered Nurse (CRC - RN) with multiple years of experience, inquired about her pay which had been approximately $19.05/ hour (sorely below fair market value as well as all the others within the department). Ms. Humiston was notified that the meeting was just for a performance review of the first 90-days and that she would have to schedule another meeting in regards to pay rate increases. Ms. Humiston attempted to schedule a meeting for the end of September 2019, however, it was pushed back to October 2019 and then taken off the schedule completely as the Director of Research Beth Kohl had resigned. An interim director was put in place, however, it was stated nothing at the moment could be done for Ms. Humiston's pay by the interim director since she was not privy to the information though Ms. Humiston was assured that the AdventHealth HR team was handling it. Ms. Humiston's pay increased minimally and she reached out in March 2020 to AdventHealth HR team directly regarding the unfair pay and pay wage disparity that continued. Erika Valdez, part of AdventHealth HR team, stated via email that the HR team was unaware of any pay wage issues though Ms. Humiston had seen evidence to the contrary. Ms. Humiston was told by AdventHealth HR staff Erika Valdes that a pay scale review was being conducted company-wide, that the results were not in yet, and that her pay would be adjusted once that was complete. Ms. Humiston continued to follow-up in

regards to the pay wage disparity and be as understanding as possible as in the weeks following Covid-19 pandemic hit. Ms. Humiston was also told that a new director of research was starting in April 2020 and would be the one to review and increase the pay as appropriate. Ms. Humiston was finally able to get a meeting with new director of research in May 2020, only to be told that her pay would increase a few dollars more - still well below fair market value as well as the other staff in the Rheumatology Research Department which were at approximately $27/ hour as well as the Cardiovascular & Digestive Health Research Departments which were approximately $32/ hour at the time. Ms. Humiston stated to the new director that this was unacceptable and requested a meeting with HR. Finally after more than a year of being underpaid, Ms. Humiston was able to meet with HR team which included the HR AVP, Michelle Myers, to be increased to the appropriate pay. During this meeting in June 2020, Ms. Humiston was told AdventHealth would only increase the pay to $26/ hour (which was still lower than all her colleagues) and that they would only give back pay at this rate from March 2020 as they claimed to be unaware prior. Other manipulation tactics AVP Michelle Myers used against Ms. Humiston was to blame her for being underpaid as she stated "Why would anyone continue to be underpaid for a year" in a June 2020 meeting. In addition, Ms. Humiston was also subjected to retaliation as AH team was requiring Ms. Humiston to transfer to the CV Research Department and increase her hours from part-time to full-time. Ms. Humiston was given a retaliatory ultimatum at the 05/2020 meeting with the new Research Director, Elsie Medina to which Ms. Humiston had requested an additional meeting with AdventHealth HR AVP Michelle Myers to further discuss.  Ms. Humiston again was given the retaliatory ultimatum at the 06/2020 meeting with AdventHealth's HR team; where the AVP of HR Michelle Myers stated that Ms. Humiston would have to transition to the Cardiovascular Research Department and into a full-time role or resign. Ms. Humiston made the AdventHealth HR team fully aware that she recently enrolled and started courses in school full-time and was a single mother so adjusting her schedule to full-time was not something she could do. In response, AVP Michelle Myers stated Ms. Humiston could have until 07/2020 to make her decision. As such, Ms. Humiston was forced to resign in 07/2020.

II.  Re-hire Employment in Clinical Research Dept Jan 30, 2023 - July 2024

In 01/2023, Ms. Humiston was re-hired by AdventHealth in the Cardiovascular Research Department. Ms. Humiston was informed that the departments are all gone through a restructuring process with many improvements and was "brand new & not like before" per Cardiovascular (CV) Research Manager Deanna and CV Supervisor Daniel Robledo. In 04/2023, Ms. Humiston let her supervisor know that in her professional opinion, another employee, Caitlin Brazell, did not seem to display appropriate competency or knowledge base of the Clinical Research Coordinator role she had been hired for. Ms. Humiston also notified Mr. Robledo that without a license to touch or any formal training/ certificate, that

3

Ms. Brazell should not be touching patients - though she had on multiple occasions & attempted blood draws without the appropriate qualifications under AdventHealth's leadership. Further investigation found that Caitlin Brazell's education, degrees, certificates, and experience were all falsified and she was eventually terminated in the beginning of 07/2023. In the latter part of 07/2023, Ms. Humiston had told her direct supervisor Daniel Robledo that she was victim to a DV assault that had taken place perpetrated by her children's father, escaped the abusive relationship, and was a single mother. As if needing proof beyond a clinical note, Daniel Robledo requested to see Ms. Humiston's black eye she was covering. Ms. Humiston became uneasy from the tone of Mr. Robledo, but complied with his request. After this, Ms. Humiston became subjected to remarks regarding her single motherhood such as it being Ms. Humiston's "choice to have kids" and that it was the "consequences of life choices" when Ms. Humiston missed work due to her child becoming sick and in the ER. Ms. Humiston also became privy to CV Supervisor, Daniel Robledo, along with other AdventHealth Leadership Deanna Allen and Christopher Davis, hiding en mass major research violations committed (i.e. No Informed Consent signed on over 100 patients/subjects, Adverse Events and Serious Adverse Events not reported); all of which could have potentially caused the shutdown of AdventHealth from conducting research if the FDA were to audit. With the increasing stress, Ms. Humiston did become ill having to use FMLA from 11/2023 - 02/2024. Upon her return, Ms. Humiston was subjected to relentless discriminatory attacks that resulted in a deterioration of her mental health and well-being, forcing her to apply for transfer and reaching out to AdventHealth HR Fredrick Kennedy. These attacks included intentionally increased, unsustainable workloads, constant moving target for expectations, falsified email follow-up from verbal discussions, electronic sabotage through deleting work completed on shared drive, and verbal harassments such as yelling demoralizing remarks as well as directly stating derogatory remarks like "Well we don't know when someone  is going to decide to take off for a few months  Finally, Ms. Humiston was able to transfer out of the CV Research Department and into the Case Management Department in 07/2024, of which Ms. Humiston was under the impression would be better, however, proved to be just as volatile.

III.  Case Management Dept start July  29, 2024 - Employment Termination May 27, 2025

Upon Ms. Humiston's transfer into the Case Management Department, Margel Lamb stated frequently "I know about" and "I heard about you" while she was still in orientation (of which was only 7 weeks starting July 29, 2024 through September 13, 2024).  Ms. Humiston was already targeted and in hindsight, Ms. Humiston is aware that this was in reference to Ms. Humiston's prior usage of FMLA leave in her previous Cardiovascular Research Department.  Margel Lamb and Trish Clark knew Ms. Humiston had been working off the clock and encouraged it - only becoming upset if they were the ones putting in Ms. Humiston's time as they would set it for 4:30 or 5 pm (though they were

4

aware Ms. Humiston had stayed longer / over hours) and knew it was electronically tracked (I.e. there is concrete proof via AdventHealth electronic timecard records that they were intentionally not paying Ms. Humiston for hours worked). Due to this, Ms. Humiston was coerced into clocking out at the designated time frame of approximately 4:30/ 5 pm and staying afterward to complete unfinished tasks.

In an October 2024 review, Ms. Humiston was praised by Margel Lamb and Trish Clark for doing so well - this was because Ms. Humiston had been clocking out herself and staying over of which Margel and Trish were well aware as Margel stated it was of Ms. Humiston's "own accord".  Prior to the December 2024 meeting, Ms. Humiston was also presented with blank Employee Reviews/ Assessments to sign by Margel and Trish that they stated would be "filled in with what was verbally talked about".  This also happened to several others within the Case Management department that were pushed to sign the blank form - of which many stated that if they tried to take one of us down through these insidious methods, then the rest of us could be witnesses for each other.

In the December 2024 meeting, Ms. Humiston stated openly with Case Management leadership that she was being forced to work off the clock, Margel Lamb responded that "it was your own choice", which was in front of the other leaders - Latanya (Tanya or Tee) Henson and Emmanual (Manny) Vazquez.   Alleged performance issues were cited during the meeting.  It is noteworthy that Margel Lamb, Manager of Case Management, was newly transferred into Case Management.  She was placed into her role with no experience in case management yet was tasked to evaluate performances of Case Managers.  Trish, Director of Case Management, stated to staff that Margel was "hired for her prior leadership experience".  Ms. Humiston became privy to information regarding the nursing unit Margel transferred from (4 Tower) that labeled her as "toxic" and known to "use all the HR tools & strategies in efforts to get staff members written-up or pushed out" utilizing manipulation to "terrorize" the staff she was managing.  So the fact that she was using the HR "counselling tools" on Ms. Humiston at 3-4 weeks into my position makes her intentions clear from the start.  The messaging from Margel Lamb was clear - if Ms. Humiston was "over hours", then it was "unapproved overtime"; if she was out on time, but the work incomplete then it was "performance deficiency".  The only choice was to work off the clock, but if I left the time clock empty for leadership to put in my time, then it was "Improper Recording of Time" because they knew they were fraudulently short-changing me, but didn't want to take the liability for it.  When they put my hours in the time record, it was electronically stamped with the name and date of the person imputing it. This is why Case Management Leadership pressured Ms. Humiston to record her own hours (incorrectly to fit their time) so the onus would be placed on Ms. Humiston for short-changing herself & Case Management Leadership weren't shown at fault - this is evident from the text messages from Margel Lamb reminding Ms. Humiston to put in her time in.

On December 30, 2024, prior to Ms. Humiston going out on FMLA, Margel also stated that she was "glad" and that it was "beneficial" that Ms. Humiston was still at work after hours since Margel was the after-hours leader on-call, but was not on site & needed Ms. Humiston to ensure the nursing department had appropriately placed a discharge packet on chart & sign for a TAFT so that the patient could leave that night - otherwise the patient would stay an additional night and the hospital would "eat the cost".  There were text messages between Ms. Humiston and Margel Lamb to corrobborate this exchange.

Ms. Humiston went out on FMLA on January 6, 2025, however, she received text messages from Margel Lamb on January 7, 2025 and January 8, 2025 demanding her to complete the Q4 ALN education. This shows an expectation from CM Leadership on Ms. Humiston that she was to work while sick on FMLA off-the-clock. Not only is there text message proof, but the ALNs are electronically date stamped to prove Ms. Humiston worked off-the-clock which are in AdventHealth Tampa's possession.

On March 5th, 2025 at approximately 9:15 am while still on FMLA & not yet cleared for my return to work by AH Employee Health, Ms. Humiston received a phone call from Trish Clark.  Mrs. Clark stated that Ms. Humiston's FMLA had ended & that Ms. Humiston needed to return to work that day.  Ms. Humiston explained that while her continuous leave had ended, she had a separate intermittent leave that had not & had not been approved yet by AH Employee Health to return to work.  Ms. Humiston also conveyed that she had called them & was told she needed a 2nd "Return to Work" form filled out and signed by the provider for the intermittent leave; she had asked AH Employee Health if she would need one every time & was told "no you won't - just this time since you haven't returned yet".  Ms. Humiston notified Trish Clark of this at which Mrs. Clark stated she "would get further clarification on the matter & I will call you back in 1 hour".  At approximately 10:30 am on 03/05/2025, Ms. Humiston received a call back from Trish Clark regarding the return to work clarification from AH Employee Health; Trish Clark stated to Ms. Humiston that she was "approved to return to work by Employee Health & need to return today by noon or else a "No call, No show" will be placed against you".  Ms. Humiston explained again that she was on FMLA Intermittent Leave, however, Mrs. Clark interrupted reiteriating Ms. Humiston was needed me back immediately - that day March 5th, 2025 by noon – or else it would be considered a "No call, No show".  Ms. Humiston, having no other choice, stated "Ok, I will come in then".

Upon Ms. Humiston's return, Trish Clark stated that Ms. Humiston was to pick up additional weekend shifts to replace the weekend shifts she didn't do while out on FMLA. Trish Clark stated that Ms. Humiston would need to sign up for 3 by the end of that schedule – which would end on 03/29/2025 – and another 3 for the following schedule as well.  This was followed up in writing by her assistant Champagne Spangler via email.  As

6

a result of this additional stress, Ms. Humiston became ill and had to take FMLA Intermittent Leave again on 03/17/2025 – 03/21/2025. Upon returning, Ms. Humiston was called into the office for an impromptu meeting on 03/24/2025 at 2pm that she was only made aware of approximately 1 hour prior. During this meeting, Margel Lamb & Trish Clark were present; They made accusations about Ms. Humiston regarding her FMLA labelling it as "suspicious" stating that she had previously put in for PTO for that week & had been denied. Ms. Humiston stated she put in for the PTO months prior, when she hadn't known she would become ill & out of work for 2 months - ultimately going into significant debt & unable to even pay bills. Ms. Humiston was understandably outraged & incredulous that Leadership would make such despicable claims against her especially as she had returned to work before she had felt ready due to Trish Clark's previous demand. Ms. Humiston **stated in the meeting that this now felt like disability discrimination – with the 1st issue being the way she was forced to return from FMLA, the 2nd issue being that she was penalized with being required to pick up extra weekend shifts due to me being out on FMLA, and the 3rd issue now being told that her FMLA was "suspicious".** As Ms. Humiston stated this in the meeting, both Trish & Margel tried to navigate the meeting away from FMLA & on to having "unapproved overtime" as the issue & call for the meeting despite the fact that Ms. Humiston was not accruing unapproved overtime at that time (as payroll records will indicate). Trish Clark and Margel Lamb stated that at they were aware that Ms. Humiston was a "struggling single mom of 4" and that they were just attempting to offer the additional weekends to her. This shows an exerted power and authority over Ms. Humiston utilizing Ms. Humiston's female single parenthood & sole providership as a means to control & discriminate against Ms. Humiston.

During the March 24, 2025 meeting, Ms. Humiston verbally reported to Margel Lamb and Trish Clark of CMS/ Medicare guidelines not being performed/ followed by Case Managers she was following behind, which was hindering daily time management. When they had asked in the meeting how things were going & if there was anything Ms. Humiston needed help with or had concerns about, she explained that a significant portion of her time in the day was in looking through the Important Message from Medicare Letters (IMLs) in the electronic medical record (EMR) because they would show marked as "signed" which what was needed to be captured by the metrics, however, upon reviewing the actual documents, it would reveal there was no actual patient signature - only stating "copy" by the Case Manager. Essentially, Ms. Humiston identified & notified the CM leadership that their "metrics" were false/ manufactured as several patients were found to have never actually received / signed their Important Message from Medicare Letters (IMLs), but the computer system was showing that they had been signed. Trish Clark and Margel Lamb stated that all the cases Ms. Humiston reported had hard copy

IMLs signed in the patients physical charts - however, Ms. Humiston also informed Trish & Margel that she had in fact already looked through the physical charts in her due diligence prior to reporting the noncompliance and there were no physical copies as Trish vehemently suggested. Finally Trish stated for Ms. Humiston "not to worry about it" and that "it isn't your concern". Ms. Humiston noted that she was not the only Case Manager that had witnessed this continual noncompliance issue during shifts. The falsified Case Management metrics involved marking "Important Message from Medicare" (IML) letters as signed when patients never received them. This resulted in fraud—it's a form of Medicare billing fraud because it suggests compliance requirements were met when they weren't, allowing them to bill for services/periods where proper patient notification protocols were bypassed as well as patients not being notified of their rights under Medicare i.e. the Right to Appeal if the patient disagreed with their discharge plan, etc. Additionally, on April 7, 2025, Ms. Humiston was told by Margel Lamb to intentionally leave blank a section in the PASSR, which is direct noncompliance. Ms. Humston did notifiy the AdventHealth HR dept regarding disability discrimination and was terminated approximately a month later.

Count I

Disability Discrimination (ADA)

Title I of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12111–12117)

**Count II**
ADA Retaliation

Title V of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12203)

**Count III**
FMLA Retaliation

Title I of the Family and Medical Leave Act of 1993 (29 U.S.C. § 2615)

**Count IV**

Whistleblower Retaliation

Florida Private Whistleblower Act (FPWA), Fla. Stat. § 448.102

Federal False Claims Act (31 U.S.C. §§ 3729–3733) – anti-retaliation provision

**Count V**

Sex-based Discrimination

8

Title VII of the Civil Rights Act of 1964

**Prayer for Relief**

**WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment in their favor and grant the following relief:**

1. CLAIM FOR DAMAGES: BACK PAY, LOST BENEFITS, AND PRE-JUDGMENT INTEREST1. Lost Wages (Back Pay):

Plaintiff was wrongfully terminated from their employment on May 27, 2025. At the time of termination, Plaintiff's regular rate of compensation was $46.62 per hour. Based on a standard 40-hour workweek, Plaintiff's base weekly wage was $1,864.80. As of July 20, 2026, exactly 59.86 weeks have elapsed since the unlawful termination. Consequently, Plaintiff has suffered a direct loss of gross back pay in the amount of $111,621.60. Plaintiff continues to accrue lost wages at the rate of $1,864.80 per week until a final judgment or settlement is reached.2. Lost Fringe BenefitsAs a direct result of the unlawful termination, Plaintiff was deprived of employment benefits that constituted a core part of their total compensation package. Over the 59.86-week period (representing 29.93 bi-weekly pay cycles), Plaintiff claims the value of these lost fringe benefits as follows:Employer Health Insurance Contributions: Defendant failed to contribute its standard bi-weekly share of $496.67 toward Plaintiff's health coverage, resulting in a direct benefit loss of $14,865.33.Retirement / 403(b) Matching: Plaintiff was deprived of the employer's 4% matching contribution on lost gross earnings, totaling $4,464.86 ($111,621.60 × 0.04).Paid Time Off (PTO) Accrual: Pursuant to employment terms, Plaintiff accrued PTO at a rate of 11% of total earnings. Defendant's unlawful termination denied Plaintiff the accrual of these hours, valued at $12,278.38 ($111,621.60 × 0.11).The total value of Plaintiff's lost fringe benefits through July 20, 2026, is $31,608.57.3. Pre-Judgment InterestPursuant to Florida Statutes § 55.03, Plaintiff is entitled to pre-judgment interest on all liquidated damages, including accumulated back pay and lost benefits, from the date of the loss. Applying the quarterly statutory interest rates set by the Florida Chief Financial Officer from the date of termination through the present date (averaging approximately 8.5% over 419 days), Plaintiff claims accrued pre-judgment interest on the combined principal ($143,230.17) in the amount of $13,975.73.4. Total Lost Compensation and BenefitsAs a direct and proximate result of Defendant's discriminatory and retaliatory conduct, Plaintiff's total lost wages, lost benefits, and statutory interest to date equals $157,205.91.

2. Compensatory Damages:Award compensation for emotional distress, pain, suffering, and reputational damage of $250,000.

3. Punitive Damages:Award punitive damages to punish the employer for intentional and malicious actions of $50,000.

9

4. Injunctive Relief:Order the employer to stop retaliating.Order the employer to train staff on disability rights.

5. Attorney's Fees and Costs:Order the employer to pay for Plaintiff's lawyer fees and court costs of currently $400.

6. Other Relief:Grant any other relief the court finds just and proper.

**Jury Demand**
Plaintiff demands trial by jury.

**Signature**

Courtney Humiston
13815 Plainview Rd. Odessa, FL 33556
656-247-7483
Thatgirlcourtney100@gmail.com
Pro Se

**Checklist**
• Paper filing
• Original signature
• JS-44 Civil Cover Sheet
• AO 440 Summons
• AO 240 if requesting fee waiver
• Follow FRCP and MDFL Local Rules.